UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| A.I.G. AGENCY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:17-cv-1502-SEP |
| | ) | |
| AMERICAN INTERNATIONAL GROUP d/b/a AIG, | ) ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

This matter is before the Court on Plaintiff A.I.G. Agency, Inc.'s ("Plaintiff") Motion for Partial Summary Judgment on Likelihood of Confusion in Missouri and Illinois, Doc. [70], and Defendant American International Group's ("Defendant") Motion for Summary Judgment, Doc. [74]. *See* Fed. R. Civ. P. 56. Both motions are fully briefed. For the reasons set forth below, Defendant's Motion for Summary Judgment is granted, and Plaintiff's Motion for Partial Summary Judgment is denied as moot.

**Background**

This is a trademark dispute between two insurance companies that both operate under the name "AIG." Plaintiff A.I.G. Agency and Defendant American International Group, better known as AIG, both sell insurance services in Missouri. Plaintiff claims that Defendant's use of the "AIG" mark (the "Mark") infringes on Plaintiff's rights under the Lanham Act, 15 U.S.C. § 1051 *et seq.,* and the common law of the State of Missouri.

In its original Complaint, filed May 12, 2017, Plaintiff alleged common law trademark infringement, violation of the Lanham Act, two counts of fraud, and one count of injurious

falsehood.  Doc. [1].  The Court dismissed the fraud and injurious falsehood causes of action in response to a Motion to Dismiss.  Doc. [43].  Plaintiff filed an amended complaint on April 13, 2018, with one count for common law trademark infringement and unfair competition and one count for violation of the Lanham Act, 15 U.S.C. § 1135(a).  Doc. [44].

Plaintiff, a family-owned Missouri-based insurance agency, argues that it has used the Mark in connection with its insurance business continuously since at least 1962—before Defendant began using it—and that Defendant has known of Plaintiff's "senior" rights in the Mark since 1995, when the parties exchanged correspondence on the subject.

Defendant, a global multi-billion-dollar insurance company, points out that it has been using the Mark for almost fifty years and owns numerous federally registered trademarks confirming and protecting its right to use it.  Defendant argues that, because Plaintiff has been on notice of Defendant's use of the Mark for decades, Plaintiff's claims are time-barred.

Plaintiff counters that Defendant abandoned the Mark in 2009, when it renamed its property and casualty insurance business "Chartis."  Plaintiff points to 2009 testimony of Defendant's interim CEO noting that the "property casualty business in the United States . . . ha[d] already begun the rebranding process," and that "the AIG name [wa]s so thoroughly wounded and disgraced that [they were] probably going to have to change it . . . ."  Doc. [88] at 7; Doc. [76-46] at 109.  Consumer confusion ensued when Defendant resumed use of the Mark, Plaintiff alleges, and because that was in 2012, Plaintiff submits that its claims are not time-barred.

Defendant denies that it ever abandoned its use of the Mark, citing marketing and brand initiatives and trademark renewal applications during the period of alleged abandonment.

Plaintiff seeks monetary damages as well as a permanent injunction requiring Defendant to stop using the Mark, to change its trade name to something that cannot be confused with the Mark, and to destroy all materials currently bearing the Mark.

## Standard of Review

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Farver v. McCarthy*, 931 F.3d 808, 811 (8th Cir. 2019). The burden then shifts to the non-movant to "present specific evidence, beyond 'mere denials or allegations [that] . . . raise a genuine issue for trial.'" *Farver*, 931 F.3d at 811 (quoting *Wingate v. Gage Cty. Sch. Dist.*, 528 F.3d 1074, 1079 (8th Cir. 2008)).

"A court considering a motion for summary judgment must view the evidence and inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party." *Dryer v. Nat'l Football League*, 814 F.3d 938, 941-42 (8th Cir. 2016). A court may not grant summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Discussion

Plaintiff alleges common law trademark infringement as well as violation of the Lanham Act's prohibition on trademark infringement. Defendant argues that Plaintiff's common law claims are barred by a statute of limitations and Plaintiff's Lanham Act claims are barred by the laches doctrine. In fact, both of Plaintiff's claims are barred by laches.

I.  **No statute of limitations bars Plaintiff's common law trademark infringement claim.**

"Missouri law does not contain a statute of limitations for trademark actions, meaning the default limitations period of five years applies to any trademark infringement claim." *Cynergy Ergonomics, Inc. v. Ergonomic Partners, Inc.*, No. 4:08-cv-243-JCH, 2008 WL 2817106, at *3 (E.D. Mo. July 21, 2008) (citing Mo. Rev. Stat. § 516.120(4)).  In trademark actions, "the time of delay is to be measured not from when the plaintiff first learned of the potentially infringing mark, but from when such infringement became actionable and provable." *Roederer v. J. Garcia Carrion, S.A.*, 569 F.3d 855, 859 (8th Cir. 2009) (citing *Angel Flight of Ga., Inc. v. Angel Flight Am., Inc.*, 522 F.3d 1200, 1207 (11th Cir. 2008)).

Because trademark infringement is a continuing wrong, though, the statute of limitations does not bar Plaintiff's claim of trademark infringement outright.  At most, it could limit Plaintiff's damages to those that have accrued during the statutory period.  *See* 6 McCarthy on Trademarks and Unfair Competition § 31:33 (5th ed.) ("Usually, infringement is a continuing wrong, and a statute of limitations is no bar except as to damages beyond the statutory period.") (collecting cases); *see also Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 837 (9th Cir. 2002).

Laches, on the other hand, can bar relief for common law trademark infringement.  Restatement (Third) of Unfair Competition § 31 cmt. (a) (1995) ("There is general agreement that it is the doctrine of laches rather than the statute of limitations that normally governs the availability of injunctive relief since infringement is typically a continuing wrong.").[1]  Therefore,

---

[1] Missouri courts apply Restatement (Third) of Unfair Competition.  *See, e.g.*, *Doe v. TCI Cablevision*, 110 S.W.3d 363, 368 (Mo. banc 2003).

the appropriate inquiry in this case is whether Plaintiff's common law claims are barred by laches, rather than by a statute of limitations.

Similarly, since Lanham Act claims do not have a defined statute of limitations, "courts use the doctrine of laches to determine whether a suit [under the Lanham Act] should be barred." *Cynergy*, 2008 WL 2817106, at *3 (internal quotation and citation omitted); *see also Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U.S. 663, 678 n.15 (2014) ("[T]he Lanham Act, which governs trademarks, contains no statute of limitations, and expressly provides for defensive use of 'equitable principles, including laches.'" (quoting 15 U.S.C. § 1115(b)(9))).  Accordingly, the Court will consider the applicability of laches to both of Plaintiff's causes of action.

## II. The laches doctrine bars both of Plaintiff's claims.

"Laches applies when a claimant inexcusably delays in asserting its claim and thereby unduly prejudices the party against whom the claim ultimately is asserted." *Hubbard Foods, Inc. v. Animal Feed Supplement, Inc.*, 182 F.3d 598, 602 (8th Cir. 1999).  To invoke the doctrine of laches, a defendant has the heavy burden of showing both that the plaintiff's delay prejudiced defendant and that the delay was inexcusable.  *See Gilbert/Robinson, Inc. v. Carrie Beverage–Mo., Inc.*, 758 F. Supp. 512, 525 (E.D. Mo. 1991); *see also Fuse, LLC v. Fuse Adver., Inc.*, No. 4:05-cv-1326-HEA, 2006 WL 355268, at *7 (E.D. Mo. Feb. 15, 2006).  A defendant must show not merely passage of time, but that it relied upon the plaintiff's "*knowledge or notice* of its infringing activities and that it would now be inequitable for the Court to enforce Plaintiff's rights in its trademark." *Fuse*, 2006 WL 355268, at *7 (emphasis added).  It is only where the delay is "so prolonged and inexcusable that it amounts to a virtual abandonment of the right by plaintiff for a long period of time" that the balance of the equities would favor the infringer. *Id.*

5

Considering the totality of the record and the parties' briefs, the Court believes Defendant has met this "heavy burden" for invoking the doctrine of laches.

### A. *Plaintiff's delay in bringing its claims is inexcusable.*

Plaintiff has had constructive notice of Defendant's use of the Mark since 1981—nearly forty years ago—when Defendant first obtained a federal trademark registration. Doc. [76-16]; *see First Bank v. First Bank Sys., Inc.*, 84 F.3d 1040, 1044 (8th Cir. 1996) (Registration of a mark "established prima facie evidence of a valid trademark and provided nationwide constructive notice of that mark."). Moreover, Plaintiff admits that it has had actual notice of Defendant's use of the Mark since "approximately 1984"—thirty-six years ago. Doc. [89] at 40.

A delay of more than thirty years is well more than enough to trigger laches in a trademark suit. *See Hubbard*, 182 F.3d at 602 (denying trademark claim where plaintiff had been "aware of any infringing conduct" and had "failed to object" for nine years while defendant had made a "substantial investment" in reliance on its authorization to use the disputed mark); *cf. MCV, Inc. v. King-Seeley Thermos Co.*, 870 F.2d 1568, 1571-72 (Fed. Cir. 1989) (four-year delay triggered equitable estoppel in the patent context); *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 192-93 (2d Cir. 1996) (five-year delay barred a misleading advertising claim under the Lanham Act).

### 1. *Progressive encroachment doctrine does not excuse Plaintiff's delay.*

Plaintiff rightly points out, however, that under the doctrine of progressive encroachment, "the time of delay is to be measured not from when the plaintiff first learned of the potentially infringing mark, but from when such infringement became actionable and provable." *Roederer*, 569 F.3d at 859; Doc. [88] at 11. The Eighth Circuit has affirmed this principle, noting that "[t]he doctrine of progressive encroachment makes sense. Otherwise, trademark holders would

6

be hoisted upon the horns of an inequitable dilemma—sue immediately and lose because the alleged infringer is insufficiently competitive to create a likelihood of confusion, or wait and be dismissed for unreasonable delay." *Id.* The question before this Court, therefore, is when the alleged infringement became "actionable and provable."

According to Plaintiff, Defendant's infringement did not become "actionable and provable" until 2012—"within five years" of this lawsuit's filing, Doc. [88] at 10—when Defendant changed the name of its property and casualty business from "Chartis" back to "AIG" and began selling insurance products directly to consumers, rather than through brokers and agencies. Before that, it would have been unreasonable for Plaintiff to sue, because the parties "worked together, were not competitors, and the public was not confused." Doc. [88] at 6, 9.

The Court cannot accept Plaintiff's characterization of the record. Uncontroverted evidence shows that Defendant was selling insurance directly to consumers for decades before 2012. Doc. [76] ¶¶ 4-5; Docs. [76-32], [76-35], [76-36]; Docs. [80-4] through [80-20]. Defendant was not a newcomer to the "direct-to-consumer" market in 2012. Moreover, the direct-to-consumer market is not the only one in which the parties competed before 2012. Plaintiff's President testified that Plaintiff had been offering "commercial policies to businesses" since its inception in 1958, Doc. [76-6] at 7, and in fact that Plaintiff's business had been roughly 70% commercial (i.e., business-to-business) for the approximately 35 years he had been with the company, *id.* at 9, 28. *See also* Doc. [76] ¶ 28; Doc. [89] at 25. Thus, the undisputed facts demonstrate that the parties were both using the AIG Mark to sell insurance in both the direct-to-consumer and commercial markets before 2012. They did not become direct competitors for the first time in 2012, as Plaintiff contends. *See* Doc. [88] at 9 ("Before 2012, Plaintiff and Defendant were not direct competitors.").

7

Plaintiff's related claim that the parties "worked together" before 2012 is, at best, an oversimplification. Doc. [88] at 6, 9. While the facts do show that Plaintiff "once sold" Defendant's products, including auto and workers' compensation insurance, Doc. [76] ¶ 75, they also show that Plaintiff's President is *currently* authorized to sell Defendant's products, *id.* ¶¶ 74, 75. The existence of that business relationship evidently does not preclude Plaintiff's trademark infringement lawsuit now; Plaintiff fails to explain how a similar relationship kept Defendant's infringement from being "actionable and provable" prior to 2012.

Finally, the record shows that Plaintiff was aware of the likelihood of consumer confusion at least as early as 1995, when Defendant demanded that Plaintiff cease and desist use of the Mark on account of that very likelihood. *See* Doc. [76-87] at 3 ("[Plaintiff's] use of [Defendant's] registered mark creates seriously [sic] likelihood of confusion, mistake, or deception . . . . Such continued activity constitutes trademark infringement, unfair competition and dilution. We assume that your client does not wish to engender confusion between its organization and our client."). This correspondence establishes that Plaintiff was alert to the likelihood of consumer confusion by 1995, if not before. *See Roederer*, 569 F.3d at 860 (emphasizing the significance of the likelihood of confusion to a district court's analysis of when a claim becomes "actionable and provable" for purposes of progressive encroachment).

In sum, the evidence does not support Plaintiff's claim that Defendant's allegedly infringing conduct suddenly became "actionable and provable" in 2012, excusing any delay on Plaintiff's part before that time. Rather, the record demonstrates that both parties have been using the Mark in the same markets for decades, each with full knowledge of the other's activities, and that Plaintiff has been cognizant of the risk of consumer confusion since 1995—twenty-two years before this lawsuit—at the latest. Doc. [76-87]; Docs. [80-42], [80-49], [80-

8

50]. Therefore, the doctrine of progressive encroachment does not excuse Plaintiff's delay before bringing this lawsuit.

### 2. *Abandonment does not excuse Plaintiff's delay.*

Alternatively, Plaintiff argues that it should not be charged with 30+ years' delay because the clock for laches was "reset" in 2012 when Defendant "resumed" using the Mark after a three-year period of abandonment. Doc. [88] at 10. Plaintiff's abandonment claim is also contradicted by undisputed facts.

To establish that Defendant abandoned the Mark, Plaintiff would have to prove by clear and convincing evidence that Defendant (1) discontinued use of the Mark in commerce; and (2) intended not to resume its use. *Cmty. of Christ Copyright Corp. v. Devon Park Restoration*, 634 F.3d 1005, 1010 (8th Cir. 2011) (citing 15 U.S.C. § 1127)). "Because abandonment constitutes a forfeiture of a property right, it 'must be strictly proved' by the party seeking abandonment." *Am. Ass'n for Justice v. The Am. Trial Lawyers Ass'n*, 698 F. Supp. 2d 1129, 1138 (D. Minn. 2010) (quoting *Electro Source, LLC v. Brandess–Kalt–Aetna Group, Inc.*, 458 F.3d 931, 937 (9th Cir. 2006). "A single bona fide use of a mark is sufficient against a claim of abandonment." *Id.* (internal quotation and citation omitted).

Plaintiff offers two factual bases for its abandonment claim: (a) the rebranding of AIG's property and casualty business in 2009; and (b) a statement made by Mr. Edward Liddy in testimony to Congress on March 18, 2009. Neither demonstrates that Defendant abandoned the Mark.

### a. Re-Naming of Property and Casualty Business

Plaintiff contends that Defendant discontinued its use of the AIG Mark when it renamed its property and casualty business subsidiary "Chartis" in 2009. In response, Defendant has

9

provided multiple examples of its bona fide uses of the Mark between 2009 and 2012. For example, Defendant used the AIG Mark on internet links to its life insurance affiliate's website. Doc. [76] ¶ 18; Docs. [80-21], [80-22]. Defendant also actively protected the Mark during that time period, sending cease-and-desist letters and initiating successful enforcement actions against entities using the Mark without authorization. Doc. [76] ¶ 19; Docs. [80-23] through [80-26].

Defendant has also submitted evidence that it renewed its trademarks with the United States Patent and Trademark Office ("PTO") several times during the time period when Plaintiff claims Defendant had abandoned the Mark (i.e., 2009-2012), submitting with every application date-stamped screenshots of Defendant's websites "showing the mark as used in commerce." Docs. [76-54], [76-55], [76-56]; s*ee also* Doc [76] ¶¶ 20-21. Defendant may have reduced its reliance on the Mark for a period of time after the financial crisis, but the bar for rebutting abandonment is very low: a *single* bona fide use is enough. *Am. Ass'n for Justice*, 698 F. Supp. 2d at 1138. The evidence adduced by Defendant here far exceeds that standard.

Indeed, the Eighth Circuit has rejected an abandonment argument based on analogous facts. *See Cmty. of Christ Copyright Corp.,* 634 F.3d at 1010-11 (rejecting abandonment argument based on evidence of defendant's ongoing use of marks at issue "in bona fide ways," asserted intent to continue doing so, and enforcement of its rights in the marks during challenged time period). Therefore, the Court finds that Defendant did not, in fact, abandon the Mark in 2009.

### b. Edward Liddy's Congressional Testimony

On March 18, 2009, Congress held a hearing about Defendant's impact on the global economy, in which Mr. Edward Liddy, who was then Defendant's interim CEO, testified. When

questioned by a member of Congress about whether Defendant thought it would retain its name, Mr. Liddy responded:

> No, I do not. **I think the AIG name is so thoroughly wounded and disgraced that we are probably going to have to change it and in fact, as we think about our property [&] casualty business in the United States, which did travel on the AIG name, we have already begun the rebranding process to AIU and on the life side, many of those businesses already have different names**. So where there may have been an approach to use one single name like AIG, we are reversing that and going back to some other individual brand names.

Doc. [76] ¶¶ 13-15 (emphasis added).

Plaintiff places considerable weight on Mr. Liddy's testimony to support its argument that Defendant abandoned the Mark. That emphasis is misplaced. Mr. Liddy's testimony is one person's (ultimately incorrect) prediction of future branding strategy, and it is far less important to the Court's analysis than Defendant's actual use (or lack thereof) of the Mark.

"[A] prospective intent to abandon a mark does not establish abandonment." *Am. Ass'n for Justice*, 698 F. Supp. 2d at 1138; *see also Cmty. of Christ Copyright Corp.*, 634 F.3d at 1011 n.4 (noting that where a party "may discontinue its use of the marks, [but] has not yet done so," the evidence does not support a finding of abandonment). It is not dispositive that Mr. Liddy believed Defendant was likely to change its name. Beliefs can turn out to be incorrect.

Here, Defendant has produced evidence that it both used the Mark and assiduously protected its rights in it throughout the period immediately following Mr. Liddy's testimony. Doc. [76] ¶¶ 16-22; Docs. [76-54] through [76-58]; Docs. [80-14], [80-18] through [80-26]. Therefore, at most, Mr. Liddy's testimony shows an as-yet-unrealized intent to discontinue using the Mark. In the face of undisputed evidence that Defendant did *not* actually discontinue the Mark, Mr. Liddy's unrealized intent is irrelevant. *See Electro Source*, 458 F.3d at 937-38

11

("[U]nless the trademark use is actually terminated, the intent not to resume use prong of abandonment does not come into play.").

### B. Defendant would suffer undue prejudice if Plaintiff were permitted to pursue its claims after 30+ years' delay.

If a plaintiff sues under the Lanham Act after the statute of limitations for the analogous state cause of action has expired, a court presumes that the defendant has been prejudiced. *See Am. Diabetes Ass'n v. Friskney Family Tr., LLC*, 177 F. Supp. 3d 855, 878 (E.D. Pa. 2016) (quoting *Santana Prod., Inc. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir. 2005)). As discussed above, the relevant limitations statute for trademark infringement under state law is five years from when the infringement becomes "actionable and provable." *Cynergy*, 2008 WL 2817106 at *3; *Roederer*, 569 F.3d at 859. Because this lawsuit was filed at least 22 years after Plaintiff became aware of the likelihood of confusion between Defendant's mark and its own, there is a presumption of prejudice, and the burden shifts to Plaintiff to show that no prejudice has occurred.

Supporting the presumption in this case is the evidence that Defendant has relied heavily upon its entitlement to use the Mark. It is undisputed that Plaintiff knew about Defendant's use of the Mark in 1984, and that it was aware of the risk of consumer confusion by 1995. Doc. [89] at 40; Doc. [76-87] at 3. Plaintiff could have objected to Defendant's use of the Mark at either of those times; it did not. Measuring from either year, Defendant has since spent hundreds of millions of dollars on advertising for companies that have operated under the AIG Mark. Doc. 76 ¶ 6. Defendant made those expenditures in reliance on the assumption that it was not exposed to legal claims over the AIG Mark, given Plaintiff's "fail[ure] to object" to Defendant's use of the Mark as it made "substantial investment" in it. *Hubbard*, 182 F.3d at 602.

The prejudice to Defendant consists in more than its outlay of funds. In a trademark infringement case with analogous facts, Judge Learned Hand observed that "the estoppel need not depend upon expenditure alone. When for eight years one plans one's business on the assumption that one may use a mark, it is a grave dislocation of the business to stop its use . . . ." *Landers, Frary & Clark v. Universal Cooler Corp.*, 85 F.2d 46, 49 (2d Cir. 1936). Judge Hand was describing a refrigerator company that had been sued by a competitor eight years after that competitor had first complained that the company was using its mark. Consider how much more "grave" a "dislocation" would result from forcing Defendant to stop using the "AIG" Mark more than *thirty* years after Plaintiff had notice that Defendant was using its Mark, after Defendant had spent those three decades building a massive multinational conglomerate. "[I]t cannot be equitable for a well–informed merchant with knowledge of a claimed invasion of right, to wait to see how successful his competitor will be and then destroy with the aid of court decree, much that the competitor has striven for and accomplished." *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813, 823 (7th Cir. 1999) (quoting *Polaroid Corp. v. Polarad Elecs. Corp.*, 287 F.2d 492, 498 (2d Cir. 1961) (citation omitted)).

Also supporting the presumption of prejudice is the fact that Plaintiff's delay has made it materially more difficult for Defendant to defend this lawsuit. Because Plaintiff did not sue until 2017, crucial witnesses are not available to participate in these proceedings. For instance, Plaintiff's founder died in 2010. Doc. [76] ¶¶ 26-27. Thus, the person who would have the most knowledge of Plaintiff's use of the Mark during its early days cannot testify. Undoubtedly the passage of such a significant amount of time has also diminished the recollections of those witnesses who are still available. Unavailability of evidence and witnesses are contributing factors to "[t]he prejudice normally contemplated in applying laches." *Goodman v. McDonnell*

13

*Douglas Corp.*, 606 F.2d 800, 808 n.17 (8th Cir. 1979) (quoting *Powell v. Zuckert*, 366 F.2d 634, 638 (D.C. Cir. 1966)).

Plaintiff offers no "specific evidence" to rebut the presumption of prejudice, bolstered by evidence of Defendant's reliance on use of the Mark and the detrimental litigation effects caused by Plaintiff's delay. *Farver*, 931 F.3d at 811. Therefore, the Court finds that Defendant would suffer undue prejudice if Plaintiff were to be permitted to pursue these claims after so long.

### C. *Plaintiff's letters to Defendant do not defeat summary judgment based on laches.*

Notwithstanding Defendant's showing of inexcusable delay and undue prejudice, Plaintiff contends that laches still should not apply because "Defendant knew of Plaintiff's seniority in the mark as early as 1995," and had "notice of Plaintiff's objection to Defendant's use of the AIG Mark." Doc. [88] at 4-5, 7-8. As evidence for these claims, Plaintiff points to two exchanges of letters between Defendant and Plaintiff—the first in 1995-1996, the second in 2008-2009—in which, according to Plaintiff, it "repeatedly had to express objections and explain to Defendant how Plaintiff was the senior user." Doc. [88] at 8.

In a 2008 letter, Plaintiff claims, "Defendant expressly acknowledged the seniority of Plaintiff's rights in the mark," making Defendant a "willful trademark infringer," who may not invoke a defense of laches. *Id.* at 4-5. In the alternative, Plaintiff argues that the mere fact that the letters put Defendant on notice of Plaintiff's objections to its use of the Mark provides an independent basis for this Court to deny Defendant's laches defense. *Id.* at 7-8 (quoting *Roederer*, 569 F.3d at 859 ("[C]ourts tend to reject a defendant's assertion of the laches defense when the defendant knew that the plaintiff objected to the use of the mark.")). "At the very least," Plaintiff argues, "the letters create a question of fact," on the basis of which this Court should deny Defendant summary judgment as to laches. Doc. [88] at 8.

14

The Court cannot agree. Even drawing all reasonable inferences in favor of Plaintiff, the letters exchanged between the parties between 1995 and 2009 do not constitute "evidence . . . such that a reasonable jury could return a verdict" that Defendant willfully infringed Plaintiff's trademark or that Plaintiff notified Defendant of its objections. *Anderson*, 477 U.S. at 248.

First, nowhere in either exchange does Defendant concede, explicitly or implicitly, that its own use of the Mark violates any right of Plaintiff's. In 1995-1996, in response to a cease and desist letter from Defendant, Plaintiff asserted its seniority in the Mark, and Defendant simply did not respond. *See* Doc. [76-87] at 2-7. Defendant responded in writing to the same claim (evidently made by phone) in 2008, and in that letter Defendant did arguably[2] acknowledge Plaintiff's seniority in the Mark within a discrete geographical region. *See* Doc. [80-42] at 4-6. But Defendant also asserted its priority in the Mark nationwide and declared that, even within the discrete geographical area within which Plaintiff operates (which Defendant called a "possible exception" to its nationwide priority), Defendant had "earned a right to use" the Mark through Plaintiff's "longstanding acquiescence." *Id.* Defendant then declared that it "does not object" to Plaintiff's use of the Mark within its limited geographical area but it would see any expansion as a "willful encroachment" upon Defendant's rights. Doc. [80-42] at 5.

Thus, even Defendant's 2008 letter provides no evidence that Defendant understood itself to be infringing Plaintiff's rights in the Mark. Rather, it evinces Defendant's understanding that it was entitled to use the Mark everywhere, including the geographical area where Plaintiff

---

[2] The Court describes this conclusion as "arguable" because it is one on which reasonable minds could disagree. At points the letter seems to acknowledge Plaintiff's seniority within a limited geographic area, but at other points the letter uses qualifying language (e.g., "allegedly" and "possible"), suggesting that Defendant is not conceding Plaintiff's claim to seniority but rather choosing not to challenge it. Because it is not necessary to the Court's conclusion—i.e., because the letter provides evidence that Defendant believed it was entitled to use the Mark regardless of whether it concedes that Plaintiff had seniority in it—the Court does not presume to decide which interpretation is the more reasonable one.

claimed to have senior rights.  Where a party believes in good faith that it is entitled to use a mark, the Court cannot conclude that it deliberately acted unlawfully.  *See, e.g., Safeway Transit LLC v. Disc. Party Bus, Inc.*, 334 F. Supp. 3d 995, 1008 (D. Minn. 2018), *aff'd*, 954 F.3d 1171 (8th Cir. 2020) (finding infringement not willful where defendant testified that he believed he was entitled to use the marks); *cf. Xiem Studio, LLC v. Nguyen*, No. 4:14-CV-1366-CEJ, 2015 WL 3795852, at *4 (E.D. Mo. June 18, 2015) (finding of willful infringement where the defendant, a supervisor of the plaintiff's business, usurped plaintiff's entire inventory branded with a trademark, set up an infringing website, then sold or offered for sale plaintiff's inventory, still branded with the trademark, on the infringing website).

The rest of the parties' letters from 1995 to 2009 likewise provide no evidence that Defendant willfully infringed Plaintiff's trademark rights.  Nor do they provide evidence that Plaintiff put Defendant on notice that it objected to Defendant's use of the Mark.  First, Plaintiff did not initiate either of the exchanges.  In both instances, Defendant contacted Plaintiff to assert Defendant's rights in the Mark, and Plaintiff responded in its own defense—without threatening any offensive action against Defendant.  Doc. [76-87] at 4-7; Doc. [80-43] at 3-4.  None of the letters could reasonably be interpreted as an overture by *Plaintiff* to put *Defendant* on notice.

Second, while Plaintiff does make various claims defending its senior rights to the Mark—including the prescient observation that, having known of Plaintiff's use of the mark for "at least ten years," Defendant would have "substantial problems with laches, estoppel and acquiescence" in a trademark infringement suit, Doc. [76-87] at 4; *see also* Doc. [80-43] at 4—nowhere in the letters does Plaintiff suggest that *Defendant* must stop using it.  This stands in stark contrast to the letters from Defendant to Plaintiff, which do demand that Plaintiff stop using

the Mark, Doc. [76-87] at 3, Doc. [80-42] at 3, 6, or at least refrain from expanding its use to new geographical territories, Doc. [80-42] at 5.

By contrast, the letters from Plaintiff to Defendant strike a relatively conciliatory tone. In the May 1995 letter, for example, after asserting Plaintiff's seniority in the Mark, Plaintiff's counsel expressed willingness to maintain the status quo, disinclination toward litigation, and openness to selling Plaintiff's rights to Defendant. Doc. [76-87] at 5. Nearly a year later, in April 1996, Plaintiff's attorney wrote again to confirm that Defendant's failure to respond signified that Defendant "do[es] not believe that [Plaintiff's] use of the AIG mark constitutes infringement, unfair competition or dilution of [Defendant's] AIG trademark, and that [Defendant] is not interested in making an offer for the rights of [Plaintiff]." *Id*. at 7. And the 2009 letter echoed—in some cases, verbatim—the sentiments Plaintiff's counsel had conveyed in 1995. Doc. [80-43].

None of the letters in the record would have put Defendant on notice that Plaintiff objected to Defendant's use of the Mark, especially absent any other indication of such an objection, e.g., a cease and desist letter from Plaintiff to Defendant, or an opposition or cancellation proceeding with the PTO. *See* Doc. [76] ¶¶ 44-45; *see also Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 205 (5th Cir. 1998) ("Any acts after receiving a cease and desist letter are at the defendant's own risk because it is on notice of the plaintiff's objection to such acts."). What the letters from 1995 through 2009 do prove is that Plaintiff had been aware of the potentially actionable similarity between the parties' marks for more than twenty years before it brought this lawsuit.

17

### III.     Laches does prevent the issuance of an injunction in this case.

Plaintiff argues that it is entitled to an injunction, even if its claims for damages are barred by laches, because "[i]njunctive relief is always an available remedy for trademark infringement." Doc. [88] at 4. Plaintiff supports this proposition by quoting selectively from *Missouri Federation of the Blind v. National Federation of Blind of Missouri, Inc.*, which states, in part, that "[e]quity will not, as a general rule, refuse an injunction on account of delay in seeking relief . . . ." 505 S.W.2d 1, 8 (Mo. Ct. App. 1973). But that is not all the *Missouri Federation of the Blind* decision says. In fact, that very sentence concludes with a critical qualifier: ". . . unless infringement has continued so long and under such circumstances as to defeat the right itself." *Id.* This case falls under that qualification.

As *Missouri Federation of the Blind* helpfully lays out:

> A trade-mark may be lost completely by laches, or the proprietor may los[e] simply the right to an account of gains or profits. ***Where the person who infringes a trade-mark does so with a show of right and justification, inexcusable laches on the part of a proprietor will work a forfeiture of the trade-mark and disentitle him to any relief whatever***; but where the infringer has appropriated the trade-mark without any show of justification, and in fraud of the proprietor's rights, laches on the part of the proprietor will usually disentitle him to an account of gains and profits, but will not defeat the remedy by injunction.

*Id.* at 9 (emphasis added) (quoting *W.A. Gaines & Co. v. E. Whyte Grocery, Fruit & Wine Co.*, 81 S.W. 648, 654 (1904)). Here, Defendant had been using the Mark for decades before Plaintiff even arguably asserted any rights against it. There was nothing fraudulent or deceptive about Defendant's use of the Mark; it had used the Mark openly, ubiquitously even, and with a reasonable belief in its own right to do so.

Defendant learned of Plaintiff's claim to seniority in the Mark in 1995, Doc. [76-87] at 4—11 years after Plaintiff had become aware of Defendant (1984), Doc. [89] at 40; 14 years after Defendant had obtained its first federal trademark registration (1981), Doc. [76-16]; and 27

years after Defendant had begun using the Mark (1968), *id*. Thus, if Plaintiff had decided to press its putative trademark rights immediately in response to Defendant's 1995 cease and desist letter, Defendant would already have had fodder for a laches defense.

But Plaintiff did not assert its rights at that time. Nor did it assert them in response to another cease and desist letter in 2008. In fact, Plaintiff *never* told Defendant to stop using the Mark until it filed this lawsuit *in 2017*—22 years later. Thus, in addition to decades of widespread use of the Mark and multiple federal registrations—which Defendant might have invoked to defend its rights to the Mark in 1995—Defendant can now also point to 22 additional years of acquiescence on the part of Plaintiff as further evidence of its right to use the Mark. Combined, these facts place Defendant squarely in the category of those who infringe "with a show of right and justification," as to whom "inexcusable laches . . . disentitle[s] [Plaintiff] to any relief whatever." *Mo. Fed'n of the Blind*, 505 S.W.2d at 9; *see also Hubbard*, 182 F.3d at 602 (applying laches where plaintiff failed to object for nine years and defendant made substantial investment "[r]elying on its apparent authorization").

For all of these reasons, the Court finds that this case is precisely one in which "infringement has continued so long and under such circumstances as to defeat" any right to injunctive relief. *Id.* at 8.

## Conclusion

Having thus demonstrated that Plaintiff's delay was inexcusable and that it caused Defendant undue prejudice, and having adequately answered Plaintiff's objections, Defendant has met the heavy burden for invoking the doctrine of laches. Therefore, Defendant is entitled to summary judgment on all counts of Plaintiff's Amended Complaint.

19

Because this Court finds that Plaintiff's claims are barred by the laches doctrine, it does not reach the parties' other arguments.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment, Doc. [74], is **GRANTED.**

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary Judgment, Doc. [70], is **DENIED** as moot**.**

An appropriate judgment shall accompany this Memorandum and Order.

Dated this 4th day of June, 2020.

*Sarah E. Pitlyk*

SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE