# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| A.I.G. AGENCY, INC., | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:17-cv-01502-SEP |
| | ) |
| AMERICAN INTERNATIONAL GROUP, | ) |
| INC. d/b/a AIG, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM AND ORDER

Before the Court is Defendant American International Group, Inc.'s Motion to Exclude Testimony of Jeffery Anderson, Doc. [196]. The motion is fully briefed and ready for disposition. For the reasons set forth below, the motion is granted.

### FACTS AND BACKGROUND

This case involves a dispute between two insurance companies that both claim the trademark "AIG." On August 16, 2023, the Court denied summary judgment for Defendant on Plaintiff's claims of common-law trademark infringement and unfair competition, as well as violation of the Lanham Act; the Court also denied Plaintiff's partial motion for summary judgment on the issue of likelihood of confusion. *See* Doc. [218]. The case is set for a jury trial on January 22, 2024.

### DISCUSSION

Defendant moves to exclude the testimony of Plaintiff's damages expert, Jeffery Anderson, on the basis that it "(1) materially overstate[s] AIG's profits, (2) fail[s] to account for AIG profits due to factors other than the AIG mark, and (3) improperly rel[ies] on [royalty] licenses not comparable to a hypothetical license between AIG and Plaintiff." Doc. [199-1] at 5. The Court agrees with Defendant that Anderson's testimony must be excluded as unreliable.

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and

>   (d) the expert has reliably applied the principles and methods to the facts of the case.

*See Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001) (summarizing Rule 702's criteria for admissibility). Under Rule 702, the trial court has gatekeeping responsibility to "ensur[e] that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (quoting *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993)). When evaluating reliability and relevance, a district court may consider:

>   (1) whether the theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review or publication; (3) whether the theory or technique has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community.

*Russell v. Whirlpool Corp.*, 702 F.3d 450, 456 (8th Cir. 2012) (citing *Daubert*, 509 U.S. at 593-94). "This evidentiary inquiry is meant to be flexible and fact specific, and a court should use, adapt, or reject *Daubert* factors as the particular case demands." *Unrein v. Timesavers, Inc.*, 394 F.3d 1008, 1011 (8th Cir. 2005). "There is no single requirement for admissibility as long as the proffer indicates that the expert evidence is reliable and relevant." *Id.*

### A. Unjust Enrichment Damages

Defendant argues that "Anderson's profit calculation is not 'the product of reliable principles and methods' as required under Rule 702 and *Daubert*," so "his unjust enrichment damages analysis must be excluded." The Court agrees.

To calculate Plaintiff's lost profits, Anderson "examin[ed] Defendant's 10-K filings for 2017 and 2018, which provided general insurance revenues earned in North America for the years 2015-2018." Doc. [199-2] at 6. Anderson next divided Defendant's North American general insurance (GI) revenue for each year by the total revenue for each year. That gave Anderson Defendant's North American GI revenue as a percentage of Defendant's total revenue for each year from 2015 through 2018. *See id.* at 7 fig.1. Anderson then took the average of those four percentages and multiplied it by Defendant's total revenue for 2013, 2014, and 2019,[1] giving him North American GI revenues for each year from 2013 through 2019. *See id.* fig.2.

---

[1] The years for which there was no North American GI revenue available on Defendant's 10-K filings.

Up to that point, Anderson's calculations appear to be reliable. All the numbers are either directly from, or reliably derived from, Defendant's 10-K filings. Anderson's next step—calculation of Defendant's North American GI profits—is where his method runs into trouble. Instead of using the North American GI profits listed on Defendant's 10-K filings, Anderson devised a different method of calculating Defendant's North American GI profits. He calculated Defendant's global profits for each year—i.e., profits from all sectors of its business, across all regions—and divided the total profit by total revenue to get "the profitability of Defendant as a percentage of revenue." *Id.* Then he multiplied the global profitability percentage for each year by Defendant's North American GI revenue to calculate Defendant's North American GI profits. *See id.* at 8 fig.4. That method yielded very different numbers for Defendant's annual North American GI profits than those reported on Defendant's 10-Ks: AIG's North American GI profits for 2015-2019, as reported on the company's 10-K filings, were negative $2.1 billion. *Id.* at 10. Anderson calculated the company's North American GI profits for the same period at $1.5 billion. *Id.*

Defendant notes the discrepancy and argues that Anderson's use of global profits as a proxy for North American GI profits is "a fatal flaw." Doc. [199-1] at 9. Anderson is not bound to arrive at the same number that Defendant reports on its 10-K, but his calculation must be "the product of reliable principles and methods." Fed. R. Evid. 702(c). Anderson's explanation for his method does not meet that burden.

Anderson claims to have chosen to use global profits as a proxy instead of using the North American GI profits reported on Defendant's 10-Ks because the 10-K filings deducted amortization expenses from the North American GI profits. Anderson explained in his deposition that it "would be wrong" to use the profits from the 10-K filings because "amortization is a noncash expense. It's an accounting expense." Doc. [203-3] at 12. While that may be true, Anderson does not appear to have applied that principle consistently. The numbers Anderson used to calculate the global profits also exclude amortization expenses. According to Defendant, "Mr. Anderson is effectively arguing that he can use global profit numbers that reflect an exclusion for . . . amortization amounts but he cannot use North American General Insurance numbers that reflect a similar exclusion for . . . amortization amounts." Doc. [208] at 8-9. Anderson's inconsistent treatment of amortization expenses undermines his justification for using global profits as a proxy, leaving Plaintiff with no

3

explanation for the $3.6 billion dollar gulf between Anderson's profit calculations and Defendant's 10-Ks.  In sum, Plaintiff's efforts to explain how Anderson's use of global profits as a proxy for North American GI profits rested on "reliable principles and methods" all fail.  Fed. R. Evid. 702(c); *see* Doc. [203-1] at 3-5.

Plaintiff falls back on appeals to Rule 702's "liberal thrust."  *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021), *cert. denied sub nom. 3M Co. v. Amador*, 142 S. Ct. 2731 (2022) (quoting *Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014)).  Plaintiff argues that "[d]ifferent experts have different opinions on [the issue of amortization]," but it "is a credibility issue for the jury to decide."  Doc. [203-1] at 9.  Plaintiff also claims that it need not "support its damages allegations with absolute exactness," since the "standard for admissibility focuses on relevancy and reliability, not disputed factual issues." *Id.* at 11.  But expert testimony can go before a jury only if the Plaintiff can prove its admissibility under Rule 702.  *See Lauzon*, 270 F.3d at 686 (citing *Daubert*, 509 U.S. at 592) ("The proponent of the expert testimony must prove its admissibility by a preponderance of the evidence.").  The Court "is thus vested with a gatekeeping function, ensuring that 'any and all scientific testimony or evidence admitted is not only relevant, but reliable.'"  *Union Pac. R. Co. v. Progress Rail Servs. Corp.*, 778 F.3d 704, 709 (8th Cir. 2015) (quoting *Daubert*, 509 U.S. at 589)).  "[I]f the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury, it must be excluded."  *Neb. Plastics, Inc. v. Holland Colors Americas, Inc.*, 408 F.3d 410, 416 (8th Cir. 2005) (citation omitted).  Anderson's method of calculating unjust enrichment damages is unreliable and would offer no assistance to a jury.  Thus, the Court must exclude his opinion on that subject.

### B. Lost Royalty Damages

Defendant also argues that Anderson's testimony "regarding Plaintiff's lost royalty damages" should be excluded as unreliable.  Doc. [199-1] at 13.  Again, the Court agrees.

Anderson's expert report claims to have "calculated the potential amount of royalty revenue that [Plaintiff] did not receive by determining a reasonable arm's length royalty rate that [Plaintiff] would have applied to license the AIG Trademark to Defendant."  Doc. [199-2] at 9.  Anderson claims that rate was established by identifying five "appropriate and comparable royalty rates based on what other parties have paid to license similar trademarks." *Id.*  Those

4

third-party rates were "then used to establish an appropriate royalty rate to apply to the use of the AIG Trademark by Defendant." *Id*.

At the outset, the Court notes that none of the proposed comparators involves either party to this case or the AIG Mark; thus, their relevance to this case is far from obvious. *See Arctic Cat, Inc. v. Sabertooth Motor Grp. LLC*, 2016 WL 4212253, at *3 (D. Minn. Aug. 9, 2016) ("A number of courts have applied Rule 702 to permit the introduction of evidence of a purportedly reasonable hypothetical royalty rate, for purposes of calculating monetary relief, where the hypothetical rate is based on prior licensing agreements between the parties *in the litigation* or involving the licensing of the *at-issue* marks to other parties." (emphases added) (collecting cases)); *see also Buffalo Wild Wings, Inc. v. Buffalo Wings & Rings*, 2011 WL 4537970, at *3 (D. Minn. Sept. 29, 2011) ("Courts consistently conclude that, where no prior licensing agreement existed between the parties in a trademark infringement suit, a royalty theory of recovery is inappropriately speculative." (collecting cases)).  "[C]ourts are less willing to permit the use of hypothetical royalty rates where the rate-estimate is based on some other basis." *Arctic Cat*, 2016 WL 4212253, at *3 (citing *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 208-09 (3d Cir. 1999)); *cf. Pioneer Hi-Bred Int'l v. Holden Found. Seeds, Inc.*, 35 F.3d 1226, 1244 (8th Cir. 1994) (in the trade-secret context, use of "reasonable royalty theory is least plausible on [the] facts" because "this theory is most appropriate when the other theories would result in no recovery or when the parties actually had or contemplated a royalty arrangement").  But even assuming that *some* unrelated third-party licenses *could* be relevant comparators for a hypothetical license between Plaintiff and Defendant, Plaintiff has not justified Anderson's chosen comparators.  Thus, Plaintiff has failed to demonstrate that Anderson's lost royalty analysis "reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(d).

Anderson's expert report provides general descriptions of the licensing agreements but does not provide a "sufficiently reliable basis on which to calculate a fair royalty."  5 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 30:85 (5th ed. 2023).  Because reasonable royalty damages in trademark cases are "atypical," *A & H Sportswear*, 166 F.3d at 208, it is helpful to look to the patent context where royalty damages are more common.  *See Marketquest Grp., Inc. v. BIC Corp.*, 316 F. Supp. 3d 1234, 1300 (S.D. Cal. 2018) ("The Lanham Act permits the recovery of damages but, unlike patent law, it does not specify

5

reasonable royalty damages. *Contrast* 15 U.S.C. § 1117(a) with 35 U.S.C. § 284."). In the patent context, courts require sufficient analysis of "why such licensing agreements are in any way comparable to the present dispute." *Automatic Equip. Mfg. Co. v. Danko Mfg., LLC*, 2021 WL 4078282, at *3 (D. Neb. Sept. 8, 2021) (excluding lost royalty damages testimony where expert did not "provide any details of the other licensing agreements by which a jury could assess their comparability to the royalty at issue in this case"). Evidence of a hypothetical royalty rate "must be tied to the relevant facts and circumstances of the particular case at issue and the hypothetical negotiations that would have taken place in light of those facts and circumstances at the relevant time." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011).

Anderson's export report provides minimal rationale for choosing the five comparators: "[W]e identified appropriate and comparable royalty rates based on what other parties have paid to license similar trademarks." Doc. [199-2] at 9. His deposition provides little more by way of explanation:

> [T]his is a really good set because it's trademarks for selling insurance products and you've got various sizes and organizations and . . . slightly different types of insurance that are being sold. So . . . it shows the universe of insurance licensing and what those rates are and it's a great proxy and it's a very reasonable rate.

Doc. [197-1] at 21. As Defendant points out, Anderson's analysis "provides no consideration of the relationship between the licensor and licensee, the scope of the trademark rights granted and any other benefits or obligations created through the license, the types of insurance companies and insurance products at issue, or the potential negotiation positions of the parties." Doc. [208] at 13.[2] Plaintiff's argument that "each license is for trademark rights in selling, marketing, and advertising insurance companies of *various sizes and organization*" practically concedes the

---

[2] Plaintiff attempts to distinguish *Automatic Equip. Mfg. Co. v. Danko Mfg., LLC*, 2021 WL 4078282, at *3 (D. Neb. Sept. 8, 2021), stating that "the expert merely provided a range of royalties without explaining why they were comparable, without even providing a description of each license or why it was relevant to the dispute." Doc. [203-1] at 12. Plaintiff inadvertently hits the nail on the head. Anderson's analysis appears to suffer from the same deficiency as the expert's did in *Automatic Equip. Mfg.* Notably, the record citation provided in apparent support of Plaintiff's counterargument does not even address the issue in dispute. *See id.* (citing Doc. [197-1] at 7-8 (discussing the states in which Plaintiff operated prior to 1968)); *see also Jaurequi v. Carter Mfg. Co.*, 173 F.3d 1076, 1085 (8th Cir. 1999) ("'[A] district court is not 'obligated to wade through and search the entire record for some specific facts which might support the nonmoving party's claim.'" (quoting *White v. McDonnell Douglas Corp.*, 904 F.2d 456, 458 (8th Cir. 1990)).

point.  Doc. [203-1] at 12 (emphasis added).  Anderson's own explanation suggests that he used a cross-section of various kinds of insurance licensing agreements, not a set of agreements selected for their similarity to the facts of this case.  *See Lodestar Anstalt v. Bacardi & Co.*, 2019 WL 8105378, at *14 (C.D. Cal. July 3, 2019), *aff'd*, 31 F.4th 1228 (9th Cir. 2022) (plaintiff that relied on an expert who "reviewed publicly available royalty rates in the alcohol industry and opined that a hypothetical royalty rate for spirit alcohol products is between 3% and 4%" did not "provide[] a legitimate basis on which to calculate a reasonable royalty").  "Such a vague and broad overview of allegedly comparable licensing agreements" is not a reliable method of calculating damages.  *Automatic Equip. Mfg. Co.*, 2021 WL 4078282, at *3 (citing *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1326 (Fed. Cir. 2009)).  Presenting Anderson's "expert testimony evidence to the jury would mislead and confuse the jury, as it [is] not a reliable means of calculating a reasonable royalty" for a hypothetical license between the parties in this case.  *Utah Med. Prod., Inc. v. Graphic Controls Corp.*, 350 F.3d 1376, 1386 (Fed. Cir. 2003).  Because Plaintiff has not "prove[n] its admissibility by a preponderance of the evidence," *Lauzon*, 270 F.3d at 686 (citing *Daubert*, 509 U.S. at 592), the Court excludes Anderson's lost royalty analysis.

Accordingly,

**IT IS HEREBY ORDERED** that the Motion to Exclude Testimony, Doc. [196], is **GRANTED**.

Dated this 18th day of September, 2023.

SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE